[No. 906-2.    Division Two.    March 16, 1973.]

THE STATE OF WASHINGTON, *Appellant*, v. DOLLY LACEY, *Individually and as Executrix, et al., Respondents.*

*Slade Gorton, Attorney General, Robert A. Wright, Assistant,* and *Charles Secrest,* for appellant.

*Richard W. Pierson* and *Paul Sinnitt,* for respondents.

ARMSTRONG, J.—In this condemnation action the state seeks to acquire approximately 31 acres of land in Pierce County from a tract of 237 acres known as the Lacey Farm. The state appeals from a jury verdict in favor of the land-owners in the sum of $345,000.

The assignments of error raise the following issues: (1) Did the trial court err in determining as a matter of law that the land in question comprised five separate tracts instead of a single larger parcel of land as contended by the state? We agree with the trial court's determination. (2) Did the trial court abuse its discretion in excluding the evidence concerning the probate sale of the property (a) as substantive evidence of value and (b) as an admission against interest against the landowners who purchased the property at the probate sale? We find no abuse of discretion in excluding the evidence of the price paid at the probate sale.

Directing our attention first to the question of whether the court erred in determining as a matter of law that the land in question comprised five separate tracts instead of a single, larger parcel of land, we find it necessary to summarize briefly the law regarding the larger parcel question before we consider the facts. A more complete analysis of the law will follow the statement of facts.

█ To decide that a tract of land constitutes a single larger parcel rather than separate parcels for the purpose of determining just compensation the courts require: (1) unity of ownership, (2) unity of use, and (3) contiguity. All must be present in order to find that a single larger parcel of land exists. In many cases the court can, as a matter of law, determine that a portion of the land is a separate or independent parcel, but ordinarily it is a question of fact for the jury. 4A J. Sackman, *Nichols on Emi-*

*nent Domain* § 14.31 (rev. 3d ed. 1971). *See In re Queen Anne Boulevard*, 77 Wash. 91, 137 P. 435 (1913).

The state argues that the entire 237 acre tract is one unit, or larger parcel, for the purpose of offsetting special benefits against the award for the taking and damaging of other portions of the owners' property.

The subject property was divided into separate parcels designated A, B, C, D and E. All of the parcels were under one ownership. There is no dispute in the testimony that at the time of trial all of the parcels were physically separated. Parcels A, B, C and D were physically separated into four separate parcels by intersecting streets, Meridian Street and Valley Avenue. Meridian Street is a primary state highway in the before condition and Valley Avenue is a secondary state highway in the before condition. Both streets have heavy traffic. Parcel E is separated by North Levee Road, Meridian Street and an independent ownership. Thus it becomes obvious that there is no physical connection or contiguity of any of the five parcels in question.

Although actual contiguity between two separate parcels is usually essential to create a unified larger parcel of land, the courts have greatly expanded the ordinary meaning of the term "contiguity" in condemnation cases. Physical separation by an intervening space is ordinarily reason for holding that the parcels are independent of each other, but it is not necessarily a conclusive test. If the land is occupied or in use, unity of use becomes an important factor in determining whether contiguity has been established. Thus a road bisecting a farm did not defeat the requirement of contiguity because the farm was operated as a single unit. *State ex rel. Biddle v. Superior Court*, 44 Wash. 108, 87 P. 40 (1906); *Nichols on Eminent Domain* § 14.31 (1), *supra*.

We must, therefore, look to the use of the property in question before the condemnation to determine whether the element of contiguity is present. Our review of the undisputed evidence of the use of the property will also

answer the question of whether there was unity of use—the most important criteria in determining whether land held under a single ownership is a single larger parcel or separate parcels of land, as those terms are used in determining just compensation in condemnation cases.

Evidence of the use of each of the five parcels was undisputed. Parcel A contained a welding shop. The rest of parcel A was previously used by the original owner for pasture and dairy purposes and subsequently leased to another person for pasture purposes. Parcel B had a small gasoline station and a small, family operated store. A portion of parcel B was leased for growing raspberries. Parcel C contained Mooney's Tavern, an airport hangar and air school; portions were leased for growing rhubarb. Parcel D was used by the Yakima Fruit Stand and agricultural portions were leased for pasture and other crops. Parcel E was always used for sign advertising purposes and leased to sign companies. Over the entire tract there were 15 separate leases and no lease extended to more than one parcel. One individual had separate agricultural leases on several parcels but did not farm the separate parcels as a unit.

In determining unity of use, it must be kept in mind that the parcels must be used in connection with *each other,* and a mere devotion to the same use by other tenants will not serve to fuse two separate parcels into one unity of use. *Condemnation Appraisal Practice,* prepared and published by American Institute of Real Estate Appraisers, 209 (1972 reprint). Not one of the tracts in question was used in connection with any other tract. There was a different use placed upon every tract although parts of several tracts were rented for various types of agricultural use to different tenants. Thus we see that there was not a unity of use for any of the five separate and independent parcels.

The evidence is undisputed that there was (1) unity of ownership, (2) a diversity of use as to each of the parcels, and (3) an absence of contiguity as to each of the parcels. Not only was unity of use in the before state not estab-

lished—the evidence demonstrated a complete diversity of use of each of the five parcels.

In determining that an entire tract of land constitutes a separate or independent parcel of land for the purpose of determining just compensation (sometimes termed the larger parcel test) there must be established (1) unity of ownership, (2) unity of use, and (3) contiguity. Each of these three elements must be present to find an independent unit or larger parcel to exist. Failure to establish one element prevents offsetting special benefits against the larger parcel, and requires a separate determination of the just compensation for the damage to each of the separate or independent parcels.

While the determination of whether the larger parcel test has been met is normally a question for the jury to determine, if reasonable minds cannot differ it becomes a question of law for the court. *Nichols on Eminent Domain* § 14.31, *supra; In re Queen Anne Boulevard, supra.*

In the case at bench reasonable minds could not differ and the trial court assumed its duty in determining, as a matter of law, that the five parcels should be treated as five separate and independent tracts for the purpose of determining just compensation.

We come now to the second major issue: Did the trial court abuse its discretion in granting the landowners' motion in limine excluding the sale price of the subject property as not being a fair market transaction?

The evidence reveals that the estate of Robert M. Lacey owned a five-eighths interest in a partnership which had as its principal asset the subject properties. The three sisters of the deceased Robert M. Lacey were partners to the extent of their one-eighth interests. It was necessary for the probate court to order the sale of the subject property for the purpose of paying the costs of administration and death taxes in the estate. The three sisters retained a lawyer and actively resisted the sale of the property from the beginning until the final confirmation of the sale by the probate court. One of the sisters died during the probate of the

estate of Robert M. Lacey and thereafter was represented by her son who eventually became her executor. The son also continued active legal objection to the sale. The objecting copartners were ordered to show cause why they should not be held in contempt for failure to cooperate in the sale of the property. The objecting copartners denied that the sale was a fair market value. The probate court, after appraisal of the property, directed the objecting copartners to execute the documents of sale under penalty of contempt of court. On the day before this action was filed the entire ownership of approximately 237 acres was sold to the Puyallup North Corporation and the Levee Corporation for a total consideration of $1,279,300, pursuant to a court order.

Mr. Elvin J. Vandeberg, attorney for the objecting copartners of Robert M. Lacey, deceased, testified that the price paid by the present owners was not its fair market value. The real estate appraiser who established the fair market value for the purposes of the probate sale was called by the state in its offer of proof. On cross-examination the appraiser for the probate court testified:

MR. PIERSON: Mr. McCarty, in your statement in the appraisal that you believe a potential purchaser would consider the pending condemnation in arriving at a purchase price for the property, can you tell us how the condemnation effected your appraisal of the subject property?

THE WITNESS: *Well, to put it briefly, the potential buyer would be buying a pig in a poke.* With the condemnation imminent they would [not] know what the compensation would be. *Generally somebody will pay less for a pig in the poke than a pig they can see. In other words, if the condemnation had not been pending my appraisal would have been more.*

(Italics ours.)

The specific question of whether probate sales are admissible in evidence has never been passed upon by the appellate courts of this jurisdiction. Analogizing this probate sale to an auction sale, the state points to *State v.*

*Calkins,* 50 Wn.2d 716, 314 P.2d 449 (1957), where the court stated that the trial court was in error in excluding an auction sale price of the subject property solely on the ground that it was not indicative of fair market value. The *Calkins* court set forth the general rule relative to evidence of the admissibility of the sales price of property sold at a voluntary public auction in a condemnation proceeding at page 727 of that opinion:

> The general rule supported by the weight of authority is that evidence of the price received at a free and voluntary public auction is competent and admissible as some evidence of value where, presumably, a willing buyer meets a willing seller in open competition.

(Citations omitted.)

The *Calkins* court did not decide the precise issue we have here but recognized that forced sales are not admissible as evidence of value, although forced sales were not an issue in that case. At page 728 the *Calkins* court further stated:

> Since the trial judge rejected the testimony relative to auction sales on the sole ground that it was not indicative of fair market value, we desire to make it clear that we have passed only upon that limited issue. *Whether or not, upon the new trial, appellant can prove (1) that the public auction sales were free and voluntary,* (2) that the property sold was not too far removed from the subject property and was comparable thereto, and (3) that the sales were not too remote in time, *are issues which we do not pass upon. These are matters as to which it is difficult to formulate specific rules, and they must rest largely in the discretion of the trial court, t~ be reviewed only for manifest abuse.*

(Citations omitted. Italics ours.)

The holding of *State v. Calkins, supra,* is consistent with the general rule relating to prior sales of the subject property as stated in 5 J. Sackman, *Nichols on Eminent Domain* § 21.2 (rev. 3d ed. 1969):

> . The general rule is that evidence of the price paid for property which is the subject of appropriation proceed-

ings is admissible, if the following conditions are satisfied:

    (a)  The sale must be bona fide;

    (b)  *The sale must be voluntary, not forced;*

    (c)  The sale must have occurred relevantly in point of time; and

    (d)  The sale must cover substantially the same property which is the subject of the appropriation action.

(Footnote omitted. Italics ours.)

█ The state contends that the probate sale was not a forced sale. The owners contend it was forced and the court properly held that the probate sale price was inadmissible. To determine which contention is correct we look first to the legal definition of a forced sale. A forced sale is generally a transaction in which there is an element of compulsion on the part of either the seller or the buyer. If the element of compulsion is based upon purely economic reasons, the sale is generally considered voluntary and therefore admissible. Where, however, a seller or buyer is forced to act under a decree, execution or something more than mere inability to maintain the property, the element of compulsion is based upon legal, not economic, factors and evidence of such a sale is not admissible. *Nichols on Eminent Domain* § 21.32, *supra.*

█ The state relies upon two cases outside this jurisdiction to support its theory that the probate sale price was admissible even though the property was sold pursuant to a court order. Both *Redevelopment Agency v. Zwerman,* 240 Cal. App. 2d 70, 49 Cal. Rptr. 443 (1966), and *State ex rel. Highway Comm'n v. Langley,* 422 S.W.2d 309 (Mo. 1967), allowed the condemnor to prove the price paid for either comparable property or the subject property at a recent probate sale. Both of these cases relied heavily on the fact that probate sales in each state were surrounded by elaborate statutory provisions to insure that the sale price reflected the fair market value of the subject property. We recognize that our own probate statutes are similarly designed.[1] Accordingly, we are in agreement with these

---

[1] *See* RCW 11.56.090.

cases and hold that a probate sale is not per se a forced sale. However, we also recognize that a probate sale is not necessarily a voluntary sale. *See State ex rel. Herman v. Transamerica Title Ins. Co.,* 17 Ariz. App. 411, 498 P.2d 485 (1972).

Because a probate sale may be either forced or voluntary, depending on the circumstances, we refrain from establishing a rigid rule. The admissibility of a probate sale, like other sales, must be left to the sound discretion of the trial court. *State v. Calkins, supra.*

We are unable to say that the trial court abused its discretion in excluding the particular probate sale price presently under consideration. According to the appraiser who established the fair market value for the probate court and who testified at the condemnation trial, his appraisal for the probate court would have been higher if the condemnation had not been imminent. Thus, his appraisal was probative of the property's fair market value *with the condemnation imminent*. No indication was given as to how much the condemnation affected his appraisal, only that his appraisal would have been more if the condemnation had not been pending. *See United States v. 55.22 Acres of Land,* 411 F.2d 432 (9th Cir. 1969). Nor can we say that the sale was voluntary. The attorney for the three sisters of Robert Lacey testified that the three sisters vehemently objected to the probate sale and sold the property only when threatened with contempt. Very clearly the trial court did not abuse its discretion in rejecting evidence of the probate sale *on the basis that the probate sale was forced and not voluntary.*

Lastly the state contends that the probate sale price was admissible as an admission of the fair market value by the defendants and that the court abused its discretion in excluding it for that purpose. We disagree. We believe the probate sale was forced. Even if we assumed that it was voluntary, however, the probate sale price may have been an admission by the defendants that $1,279,300 was the fair market value *with the condemnation imminent* but this

was not an issue in the trial. Neither the purchase nor the sale of the property at the probate sale was an. admission of the property's fair market value.

The owners request this court to award reasonable attorney fees. Under RCW 8.25.070 they have qualified for the allowance of the attorney fees. In *State v. Kodama*, 4 Wn. App. 676, 483 P.2d 857 (1971) the court approved the allowance of reasonable attorney fees on appeal and remanded the cause to the trial court to determine the amount of the attorney fees. We think it is appropriate for the trial court to make this determination and remand it to the trial court for the determination of reasonable attorney fees.

Judgment affirmed.

PEARSON, C.J., and PETRIE, J., concur.